UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

**TIMOTHY GLOWACKI**

**Plaintiff,**

    v,

**COMMISSIONER OF SOCIAL SECURITY,**

**Defendant**.

Case No. 1:19-cv-01526-TPK

OPINION AND ORDER

## OPINION AND ORDER

    Plaintiff Timothy Glowacki filed this action under 42 U.S.C. §405(g) asking this Court to review a final decision of the Commissioner of Social Security. That final decision, issued by the Appeals Council on September 13, 2019, denied Mr. Glowacki's application for social security disability benefits. Mr. Glowacki has now moved for judgment on the pleadings (Doc. 9), and the Commissioner has filed a similar motion in response (Doc. 14). For the following reasons, the Court will **GRANT** Plaintiff's motion, **DENY** the Commissioner's motion, and **REMAND** the case to the Commissioner for further proceedings pursuant to 42 U.S.C. §405(g), sentence four.

## I. BACKGROUND

    Plaintiff was 42 years old when he protectively filed his application for benefits on December 10, 2015. Plaintiff alleged that had been disabled since December 13, 2014. After initial administrative denials of his claim, Plaintiff appeared at an administrative hearing held on September 18, 2018, at which he and Eric D. Dennison, a vocational expert, both testified.

    The Administrative Law Judge issued an unfavorable decision on September 21, 2018. In that decision, she first concluded that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2019, and that he had not engaged in substantial gainful activity since his alleged onset date. Next, the ALJ determined that Plaintiff suffered from severe impairments including cervical radiculopathy, post-fusion of the cervical spine, chronic pain syndrome, cervical postlaminectomy syndrome, bursitis of the left shoulder, status post rotator cuff repair, and debridement with biceps tenodesis. She further found that he had a number of non-severe impairments and that none of his impairments met the criteria for disability set out in the Listing of Impairments.

    According to the ALJ, Plaintiff's impairments limited him to performing work at the light

exertional level. However, he could only occasionally reach above shoulder level or straight out in front of his body with his left arm, could never climb ladders, ropes, or scaffolds, could not work at unprotected heights, and could only occasionally stoop, kneel, crouch, and crawl.

Next, the ALJ determined that Plaintiff was unable to perform his past relevant work as an iron worker, construction worker, or ski lift operator.. At the administrative hearing, the vocational expert testified that someone of Plaintiff's age and educational history and who had the limitations ascribed to him by the ALJ could perform unskilled light jobs such as information clerk, checker, and shipping and receiving clerk. The ALJ accepted this testimony and found that those jobs existed in significant numbers in the national economy. She therefore concluded that Plaintiff was not disabled within the meaning of the Social Security Act.

Plaintiff, in his motion for judgment, asserts the following claims of error. He argues (1) that the evidence conclusively showed that the frequency of his medical treatment would have cause him to miss too much work to be gainfully employed; (2) that the ALJ erred by not finding that he suffered from severe mental disorders including depression and anxiety; (3) that the ALJ erred by not including psychological limitations in Plaintiff's residual functional capacity; (4) that new and material evidence warrants a sentence six remand; and (5) that the ALJ erred in finding that Plaintiff cold occasionally reach above shoulder level or in front of his body with his left arm.

## II. THE KEY EVIDENCE

The Court will begin its review of the record by summarizing Plaintiff's testimony at the administrative hearing. It will then recap the relevant information contained in the medical records.

Plaintiff first testified that he had an eight-year-old daughter whom he cared for every other weekend. He cooked for her, did her laundry, and was present when she played with her cousins. He also attended her school activities. He lived by himself in an apartment but had help from his mother, and said the apartment was part of her house. Before he lost his license due to a DUI, he drove regularly to appointments and to pick up his daughter.

On a daily basis, Plaintiff said that he cleaned, did dishes, did laundry, cooked, and went grocery shopping, although his mother usually accompanied him to the store. He testified that he had some vocational training including welding classes and his apprenticeship as an iron worker. He also had a CDL at one time. In the past he worked as an iron worker and a truck driver as well as a heavy equipment operator, and when much younger he ran a ski lift. At the time of the hearing, his physical activity was limited to going for walks and walking his dog.

Plaintiff stopped working in December, 2014, after developing severe pain in his left shoulder and needing surgery. His symptoms at that time included left shoulder pain, weakness, swelling, numbness, and tingling in his left arm. He was also having neck pain which had not

improved even though he had two surgeries for it.  Plaintiff had two shoulder surgeries as well which included surgery on his biceps.  Those had improved his functioning but he still had pain and weakness, which increased with use of his left arm.  Plaintiff also underwent two surgeries for carpal tunnel syndrome and still had some numbness and tingling, particularly in his left hand.  The last surgery Plaintiff experienced was on his left foot, which was needed to remove bone spurs from his heel.  He still had heel pain even when lying down.  He could walk a mile, but with pain, and he was going to have surgery on his left knee as well as more surgeries on both feet.

Lastly, Plaintiff testified that he could sit for 15 minutes to half an hour and could stand but needed to be moving constantly.  He could lift about 20 pounds, but not continuously.  He was also receiving treatment for depression and was tired all the time, in addition to experiencing symptoms of irritable bowel syndrome.

The vocational expert, Dr. Dennison, identified Plaintiff's past relevant work as an iron worker, a construction worker, and a ski lift operator.  Those jobs ranged from light to very heavy in exertional level.  He was then asked some questions about a person of Plaintiff's age and educational level who could do light work but with various restrictions including only occasional reaching overhead with the left arm.  Dr. Dennison said that someone so limited could not perform any of Plaintiff's past work but could do light, unskilled work like information clerk, checker, and shipping and receiving weigher.  He gave numbers for each job as they exist in the national economy.  The expert also identified a number of sedentary jobs consistent with the physical limitations identified by the ALJ.  He said that someone off task more than 10% of the time or absent from work more than one day per month could not do those jobs, however, nor could a person who could not sustain attention for concentration for at least a two-hour period.

The pertinent medical records show the following.  Plaintiff had an x-ray taken of his cervical spine in October, 2014, which showed cervical spondylosis and mild scoliosis, and an MRI done at the same time showed a minimal disc protrusion at C3-4 with small broad-based protrusions at two other levels.  A later report showed that his neck and related arm pain were long-standing problems and that he had opted for surgery on his neck.  The operation occurred on December 22, 2014.  Plaintiff subsequently had surgery on his left shoulder on May 14, 2015, after which he underwent six months of rehabilitation.  He was still complaining of some shoulder pain following therapy, but after examining him, Dr. Gambacorta recommended that he transition back into work, either to his prior job as an ironworker or to a new career if ironworking proved to be too painful.   (Tr. 465-66).  A prior note showed that Plaintiff had been pleased with the outcome of the surgery and had no pain, weakness, loss of motion, tingling, or numbness.  Other records from 2015 also contain diagnoses of chronic left C7 radiculopathy and carpal tunnel syndrome.

Early in 2016, Plaintiff was seen by a consultative physician, Dr. Balderman, who noted that Plaintiff's chief complaint was cervical spine pain and left shoulder pain.  He also reported persistent tingling and numbness in his left arm.  Plaintiff said he was able to cook, bathe, and

-3-

dress himself. He had a normal gait and stance and was able to maneuver without assistance. Cervical spine range of motion was normal with mild pain and he also had full range of motion in his shoulders and normal grip strength and dexterity. Dr. Balderman said that Plaintiff had a mild to moderate limitation in frequent changes in position of his head and mild limitations in reaching, pushing, and pulling. (Tr. 623-26). Shortly before that evaluation, Plaintiff had told his physical therapist that his arm pain was worst when lifting weights or doing hard work. (Tr. 639). By the end of seven physical therapy sessions, his functional ability improved and his pain decreased but he was still having some numbness and tingling in his fingers. He had another neck surgery in March of 2016 which improved his left arm pain and functionality during the months following surgery, although he still had pain when working out at the gym. During a functional capacity evaluation done in November of 2016, he reported pain when using force or encountering resistance while reaching overhead with his left arm. His walking and standing did not appear to be limited. (Tr. 725).

In 2017, Plaintiff had additional surgeries including a left shoulder arthroscopy with rotator cuff repair, which led to additional functionality in the shoulder (although his doctor advised him to be cautious about lifting). He continued to have pain in his biceps, however, as well as bilateral symptoms attributed to carpal tunnel syndrome (which was described in September of that year as mild to minimal). Nevertheless, he had a left carpal tunnel release done on December 11, 2017 and a similar surgery on his right wrist on January 8, 2018. Subsequent physical therapy notes and treatment notes confirmed that he had done well since his shoulder surgery but continued to be troubled by biceps pain, and that although he had been released for any and all activities, his physician did not want him going back to his ironworking job. (Tr. 905).

Plaintiff had foot surgery in early 2018 after experiencing left foot pain. His left knee pain was seen as a contributing problem. In April of that year, Dr. Al-Humadi expressed the opinion that Plaintiff was disabled due to his left knee and left shoulder conditions, an opinion shared by physician's assistant James Tkacik. (Tr. 1646, 1672). Plaintiff had also undergone epidural steroid injections in that time frame without relief but did get some relief from medial branch blocks done in May, 2018. Another physician, Dr. Gibbons, said that Plaintiff was not disabled from his neck condition but "he has multiple factors." (Tr. 1703).

As far as mental health conditions are concerned, on October 3, 2017, Plaintiff underwent a depression screening at a regular checkup. His major issue at that time was chronic pain and he denied any loss of interest in activities or feelings of hopelessness and depression. The same was true three months later, but on March 14, 2018, he indicated just the opposite, stating that he was experiencing depressive symptoms more than half the time. At that appointment, his symptoms were interpreted as indicative of mild depression. (Tr. 1671). He was started on medication. Plaintiff was also referred to the Behavioral Medicine Clinic for help in managing his chronic pain. At that time, he had pain in his head, neck, shoulders, elbows, wrists, knees, feet, and low back. A test showed that he had a tendency toward intense and uncontrollable worry, and he also had difficulties with memory and concentration. He was diagnosed with pain disorder which

included psychological factors and also with an adjustment disorder with mixed depressed mood and anxiety. (Tr. 1769-73).

Plaintiff was seen for a diagnostic mental health assessment on May 21, 2018, upon referral from his doctor for treatment of depression and anxiety. His reported symptoms included anxiety attacks, depression, suicidal ideation, and problems focusing. His mood was anxious and depressed, and both counseling and medication were recommended. (Tr. 1781-82). Subsequently, he attended individual counseling sessions with Dr. Radziwon, a psychologist, on July 26, 2018, August 9, 2018, and August 23, 2018 to refine his skills for managing chronic pain related to depression and anxiety, and he was encouraged to resume seeing a counselor and to schedule an appointment with a psychiatrist. (Tr. 1769-78).

Finally, the record shows that beginning on May 21, 2018, Plaintiff saw a counselor, Kathleen MacRoy, for treatment of generalized anxiety disorder and dysthymia. (Tr. 1780-88). He had been referred by his medical doctor and told Ms. MacRoy that for years he had been treated for both physical and emotional pain, experiencing depression and anxiety since he stopped working in 2014 due to physical issues. He reported anxiety attacks, relationship issues, depression, suicidal ideation, sleep issues, and focusing problems. He appeared depressed and his speech was fast and excessive. The treatment plan included managing his symptoms of anxiety and depression. She saw him again on June 11, 2018, and August 11, 2018, repeating many of the same observations she made initially. There are additional records of counseling sessions with Ms. MacRoy in 2018 and 2019, but they were submitted after the ALJ's decision had issued and will be discussed further in connection with Plaintiff's request for a sentence six remand.

## III. STANDARD OF REVIEW

The Court of Appeals for the Second Circuit has stated that, in reviewing a final decision of the Commissioner of Social Security on a disability issue,

> "[i]t is not our function to determine de novo whether [a plaintiff] is disabled." *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir.1996). Instead, "we conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir.2009); *see also* 42 U.S.C. § 405(a) (on judicial review, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive.").
>
> Substantial evidence is "more than a mere scintilla." *Moran*, 569 F.3d at 112 (quotation marks omitted). "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. (quotation marks omitted and emphasis added). But it is still a very deferential standard of review—even more so than the "clearly erroneous" standard. *See Dickinson v. Zurko*, 527 U.S.

150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999). The substantial evidence standard means once an ALJ finds facts, we can reject those facts "only if a reasonable factfinder would have to conclude otherwise." *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir.1994) (emphasis added and quotation marks omitted); *see also Osorio v. INS*, 18 F.3d 1017, 1022 (2d Cir.1994) (using the same standard in the analogous immigration context).

*Brault v. Soc. Sec. Admin., Com'r*, 683 F.3d 443, 447–48 (2d Cir. 2012)

## IV.  DISCUSSION

### A.  Frequency of Medical Treatment

Plaintiff's first claim of error is founded on the assertion that he could not have attended work on a sustained basis from his onset date forward because of the amount and timing of the medical treatment he received.  He notes that the record showed 186 separate days of office visits or surgeries from his onset date to the date of the ALJ's decision, an average of four days per month, and that according to the vocational testimony, being absent from work that often is inconsistent with substantial gainful employment.  Plaintiff does not cite any legal authority in support of this claim apart from the general rule that if a claimant cannot sustain substantial gainful employment, he is necessarily disabled.  The Commissioner, citing to *Cavalieri v. Comm'r of Social Security*, 2019 WL 2710110 (W.D.N.Y. June 28, 2019), argues that absent a showing that Plaintiff would have missed a full day of work for each treatment and that he could not have scheduled these appointments to accommodate his work schedule, the ALJ appropriately found (albeit implicitly) that Plaintiff's medical schedule would not have prevented him from maintaining employment.

There does not appear to be a substantial body of case law addressing this type of argument.  However, it would seem, at the least, that if a Plaintiff were to prevail on such an argument, the record would have to contain evidence that a claimant who needed the type of medical treatment which Plaintiff underwent could not have attended work on a consistent enough basis to prevent him or her from being terminated for excessive absenteeism.  Here, like the situation which was presented in *Leach v. Saul*, 2020 WL 473753, at *5 (E.D. Mo. Jan. 29, 2020), "there is no medical opinion from a treating doctor about Plaintiff's need to miss work or that the appointments need[ed] to take place during work hours."  That is the same conclusion that this Court reached in *Cavalieri*, and the facts of this case do not compel a different result.  Consequently, the Court finds no merit in Plaintiff's first claim of error.

### B.  Severe Mental Impairment

Next, Plaintiff contends that the ALJ erred by finding that Plaintiff did not suffer from any severe mental impairments.  The ALJ concluded that Plaintiff had mental impairments including anxiety disorder and depressive disorder but determined that they were not severe.  In

her decision, she based that conclusion on three factors: (1) that there was "no evidence that the claimant engaged in any formal outpatient or inpatient treatment" apart from a behavioral assessment done in 2018 (Tr. 16); (2) that the state agency medical examiner determined that these impairments were not severe, *id.*; and (3) that Plaintiff had no limitation in the area of understanding, remembering, and applying information, a mild limitation in the area of interacting with others, a mild limitation in the area of concentrating, persisting, and maintaining pace, and no limitation in the area of adapting or managing oneself - findings which led to the conclusion that any mental impairments were not severe (Tr. 16-17). Plaintiff argues that, contrary to the ALJ's statement, there is no state agency medical review in the record on the issue of mental impairment, and he points out that the ALJ appeared to have ignored or overlooked the treatment notes from both Dr. Radziwon and Ms. MacRoy as well as unduly downplaying the evidence from the doctors treating his physical conditions that he was experiencing significant symptoms of depression and anxiety.

The Commissioner concedes that the ALJ relied in part on an opinion not in the record, but contends that this error had no effect on the overall decision. The Commissioner's memorandum is silent on the question of the ALJ's statement concerning the absence of records of mental health treatment, and that statement is not borne out by the record. However, the Commissioner defends the ALJ's decision on grounds that substantial evidence supports each of the four findings made by the ALJ which led to the conclusion that any mental impairment was not severe. In reply, Plaintiff argues both that without the benefit of a medical opinion, the ALJ was not permitted to interpret the evidence in the way that she did, and that she also erred by failing to include any mental limitations in her residual functional capacity finding even if she correctly determined that Plaintiff's mental impairments were not severe.

The Court concludes that the ALJ's multiple errors on the issue of severe impairment necessitate a remand. First, while the ALJ cited to evidence of record in determining that Plaintiff did not have a severe mental impairment, she also relied to an unknown extent on evidence not in the record. The Court simply cannot determine if the ALJ followed the reasoning of the state agency reviewer whose opinion she cited or the extent to which she was influenced by it. When a reviewing Court cannot determine the basis of an ALJ's decision, remand is generally required. *See, e.g., Veino v. Barnhart*, 312 F.3d 578 (2d Cir. 2002). Second, the ALJ appears not to have considered at all the only evidence in the record from mental health providers, and she also used the absence of such evidence - which is an inaccurate characterization of the record - as an additional reason to discount the presence of a severe mental impairment. This Court has said that when an ALJ's "conclusions are improperly based on a selective citation to, and mischaracterization of, the record evidence," remand is the appropriate remedy. *See Pabon v. Colvin,* 2015 WL 5692845, at *4 (W.D.N.Y. Sept. 28, 2015). There is also some potential merit in Plaintiff's claim that the ALJ acted as her own medical expert by inferring functional limitations (or the lack thereof) from statements made by or to the various physical medical treating sources, and it is of additional concern that she did not impose any mental functional restrictions even though she found mild limitations when performing the step two analysis (although that is not a residual functional capacity analysis, of course). In any

event, the combined impact of these errors is sufficient to justify an order of remand.

### C. Sentence Six Remand

Plaintiff has also argued that the case should be remanded to the Commissioner pursuant to 42 U.S.C. §495(g), sentence six, based on new and material evidence. The Court will summarize that evidence before analyzing this claim.

Plaintiff's counselor, social worker Kathleen MacRoy, submitted an evaluation of Plaintiff's mental functional capacity dated February 19, 2019. She concluded that while Plaintiff had an unlimited ability to remember work-like procedures and to remember and carry out very short and simple instructions, his ability to maintain attention for two-hour periods and to work with others was only fair, and he had either poor or no ability to get through a work week without interruptions from psychologically-based symptoms. She said these limitations dated back to 2014, although she had been treating him only from 2018 forward. Lastly, she described his symptoms as including poor concentration, anxiety attacks, and difficulty relating to others in a calm manner. There are also a number of progress notes beginning in May, 2018, confirming that he appeared with a depressed and anxious mood and had trouble focusing and listening in conversation, some of which are part of the record which was before the ALJ.

The evidence also includes additional treatment notes from Dr. Al-Humadi. They show continued treatment for lower leg weakness and biceps pain. An EMG study suggested L5/S1 radiculopathy and an MRI showed a herniated disc at that level, and a depression screening done by Foothills Medical Group indicated severe depression. Notes also showed normal straight leg raising and a normal gait, but confirmed a failed left biceps repair and indicated Plaintiff was reporting continuous pain.

As this Court said in *Wilbon v. Colvin*, 2016 WL 5402702, at *3 (W.D.N.Y. Sept. 28, 2016),

> Pursuant to 42 U.S.C. § 405(g), a reviewing court "may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding."
>
> In *Tirado v. Bowen*, 842 F.2d 595, 597 (1988), the Second Circuit elaborated on this language and held that a claimant seeking remand for consideration of additional evidence must satisfy a three-part test. First, the claimant must show that the proffered evidence is "new and not merely cumulative of what is already in the record." *Id*. Second, the claimant must show that the evidence is "material." *Id*. In this context, the concept of materiality requires both that the evidence is relevant to the time period for which benefits were denied and that there is a

reasonable possibility that the evidence would have affected the outcome of the claimant's application. *Id*. Third, the claimant must show "good cause" for failing to present the evidence earlier. *Id*.

Here, because the Court is ordering a remand under 42 U.S.C. §405(g), sentence four, it need not determine whether the additional evidence from Ms. MacRoy and Dr. Al-Humadi would independently justify a remand. Given that Ms. MacRoy has related Plaintiff's mental limitations to a period prior to the ALJ's decision, however, that evidence should clearly be considered as part of the proceedings conducted after remand, and the ALJ should also take a second look at the issue of how severely Plaintiff is limited in the use of his left arm by what appears to have been failed biceps surgery.

## V. CONCLUSION AND ORDER

For the reasons set forth in this Opinion and Order, the Court **GRANT**S Plaintiff's motion for judgment on the pleadings (Doc. 9), **DENIES** the Commissioner's motion for judgment on the pleadings (Doc.14), and **REMANDS** the case to the Commissioner for further proceedings pursuant to 42 U.S.C. §405(g), sentence four.

                                                **/s/ Terence P. Kemp**
                                                **United States Magistrate Judge**